735 S.E.2d 635

**In the Matter of Ivan N. WALTERS, Petitioner/Respondent.**

No. 27067.

Supreme Court of South Carolina.

Heard July 20, 2011.

Decided Nov. 21, 2011.

Lesley M. Coggiola, Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

Ivan N. Walters, of Rock Hill, pro se.

PER CURIAM.

This matter is before the Court on petitioner/ respondent's Petition for Reinstatement and the reciprocal disciplinary provisions of Rule 29, RLDE, Rule 413, SCACR.

## PROCEDURAL BACKGROUND

Petitioner/respondent was admitted to the South Carolina Bar in 1988 and to the North Carolina Bar in 1993. By order dated September 28, 2009, the Court definitely suspended petitioner/respondent from the practice of law in this State for twelve (12) months, retroactive to June 27, 2008, the date of his interim suspension.[1] *In the Matter of Walters*, 385 S.C. 235, 683 S.E.2d 801 (2009).

In June 2010, petitioner/respondent filed a Petition for Reinstatement and the matter was referred to the Committee on Character and Fitness (the Committee) pursuant to Rule 33(d), RLDE. After a hearing on October 21, 2010, the Committee issued a Report and Recommendation. The March 31, 2011, Report and Recommendation recommends petitioner/respondent be reinstated subject to certain conditions.

ODC filed exceptions to the Report and Recommendation. ODC asserted petitioner/respondent failed to promptly notify ODC that he had been disbarred by the North Carolina Bar on September 9, 2010, as required by Rule 29(a), RLDE, and, further, never informed the Committee of his North Carolina disbarment. As a result, ODC requested the Court either

---

1. *In the Matter of Walters*, 378 S.C. 596, 663 S.E.2d 482 (2008).

deny the Petition for Reinstatement or require petitioner/respondent to reappear before the Committee to address his failure to notify the Committee of his disbarment in North Carolina and the effect of the disbarment on his Petition for Reinstatement in South Carolina.

Petitioner/respondent filed exceptions to the conditions of reinstatement proposed by the Committee. In addition, he asserted he learned of his North Carolina disbarment "a couple of weeks" after the issuance of the September 9, 2010, Order of Disbarment. According to petitioner/respondent, when ODC approached him with a letter from North Carolina immediately before the October 21, 2010, Committee hearing, he told ODC he had been disbarred in North Carolina. He stated he did not inform the Committee of his North Carolina disbarment because it was for the same misconduct for which he had been sanctioned by the Court and, therefore, the disbarment was not relevant to his Petition for Reinstatement.

In the meantime, by letter dated April 5, 2011, ODC notified the Court that petitioner/respondent had been disbarred by the North Carolina Bar on September 9, 2010.[2] *See* Rule 29(a), RLDE. In accordance with Rule 29(b), RLDE, the Clerk of Court provided ODC and petitioner/respondent with thirty (30) days in which to inform the Court of any reason why the imposition of identical discipline in this State was not warranted.

Petitioner/respondent submitted a document entitled "Claim of Petitioner" maintaining that, because he was considering filing an appeal from the Order of Disbarment, his notice to ODC of the Order of Disbarment was timely within the meaning of Rule 29(a), RLDE. He further asserted the misconduct which formed the basis for his North Carolina disbarment was "basically" considered by the Court in its order imposing the twelve (12) month suspension from the practice of law and, therefore, the imposition of reciprocal discipline for the same misconduct would result in grave injustice. Alternatively, petitioner/respondent claimed that, if the Court concluded the imposition of reciprocal discipline was appropriate, it would be inequitable for this Court to disbar him for the

---

2. The Order of Disbarment is attached.

misconduct found by the North Carolina State Bar because the Court has imposed lesser sanctions for similar misconduct.

After oral argument, the Court granted petitioner/respondent's request to brief the issues raised by this matter.

## DISCUSSION

### Reciprocal Discipline

Rule 29(d), RLDE, Rule 413, SCACR, provides that the Court shall impose the identical discipline imposed in another jurisdiction unless the lawyer or ODC demonstrate or the Court finds that it clearly appears upon the face of the record from which the discipline is predicated that the identical discipline is improper for one of four stated reasons:

1) the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process;

2) there was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Supreme Court could not, consistent with its duty, accept as final the conclusion on that subject;

3) imposition of the same discipline by the Court would result in grave injustice; and

4) the established misconduct warrants substantially different discipline in this state.

If the Supreme Court determines that any of the above elements exist, it shall enter such other order as it deems appropriate. The burden is on the party seeking different discipline in this jurisdiction to demonstrate that the imposition of the same discipline is not appropriate. Rule 29(d), RDLE.

### I. Timeliness of Notice of Disbarment

■ Petitioner/respondent asserts he promptly notified ODC of his disbarment by the North Carolina State Bar by informing Disciplinary Counsel of the discipline immediately before his October 21, 2010, reinstatement hearing. He states that he received service of the September 9, 2010, Order of Disbarment on September 20, 2010, and contemplated filing an appeal. According to petitioner/respondent, under the North Carolina Rules of Appellate Procedure, he had until October

20, 2010, to assert his appellate rights and, until that date, the Order of Disbarment was not final and, therefore, his notice to ODC on October 21, 2010, was timely.

Rule 29(a), RLDE, states, in part, as follows:

Upon being disciplined ... in another jurisdiction, a lawyer admitted to practice in this state shall promptly inform disciplinary counsel of the discipline ...

Petitioner/respondent did not promptly inform ODC of the September 9, 2010, Order of Disbarment. Rule 29(a), RLDE, does not permit a lawyer who has been disciplined in another jurisdiction to delay informing ODC of discipline while the lawyer contemplates the filing of an appeal or until such time as the disciplinary order becomes final in the other jurisdiction. Petitioner/respondent's notice to ODC on October 21, 2010, more than one month after he received the North Carolina Order of Disbarment, did not comply with Rule 29(a), RLDE.

## II. Same Misconduct

■ Petitioner/respondent argues the Court should not impose reciprocal discipline because the misconduct for which he was disbarred in North Carolina is the same misconduct for which he was suspended from the practice of law in South Carolina. We disagree.

The Court's order imposing discipline on petitioner/respondent addressed two matters of misconduct. The first matter was petitioner/respondent's felony conviction for violating 18 U.S.C. § 4, entitled "misprision of felony." The opinion states that petitioner/respondent pled guilty to misprision of felony, admitting that, although he had knowledge of the actual commission of bank fraud from April 2003 through October 2004, he concealed the information by failing to inform a judge or other person in authority of the felony. *In the Matter of Walters, supra.*

The second matter involved petitioner/respondent's completion of a series of closings on the same piece of property. At the time of the last closing for Mr. and Mrs. Doe, petitioner/respondent did not satisfy the mortgage from the closing proceeds and did not insure that a release was executed and filed. In a previous closing on the same property, petition-

er/respondent failed to insure the proper release and/or satisfactions were filed by the lender. *Id.*

In addition to addressing petitioner/respondent's misprision of felony conviction, the North Carolina Order of Discipline discussed petitioner/respondent's misconduct as the closing attorney for more than twenty real estate transactions involving Kyle Wimmer.[3] The Order of Discipline reports that, in numerous instances involving the sale of property to and from Wimmer or his affiliate business(es), petitioner/respondent knowingly made false statements on HUD–1 Settlement Statements for the purpose of influencing the action of the lending institution whose accounts were insured by the Federal Deposit Insurance Corporation in violation of 18 U.S.C. § 1014. The false statements allowed Wimmer, in some of the instances, to "flip" the loans and/or properties. In addition, on several occasions, petitioner/respondent disbursed funds from the lending institution in a manner which was inconsistent with the disbursement listed on the HUD–1 Settlement Statements provided to the institution. None of the reported instances of misconduct involved Mr. and Mrs. Doe.

Neither petitioner/respondent's knowingly false statements on numerous HUD–1 Settlement Statements nor his improper disbursements were considered by the Court in its order suspending petitioner/respondent from the practice of law. Consequently, it is appropriate for the Court to consider the imposition of reciprocal discipline for the misconduct which was not previously addressed by the Court.[4]

### III. Infirmity of Proof

▮ Petitioner/respondent argues that, if the Court determines the North Carolina Order of Disbarment addresses

---

3. As stated in the Order of Discipline, Wimmer was convicted of bank fraud and money laundering in connection with a real estate investment scheme. Petitioner/respondent's misprision of felony conviction was in connection with Wimmer's real estate investment scheme.

4. Petitioner/respondent alleged that, except for the misconduct involving one property located in North Carolina, ODC investigated all of the misconduct addressed in the North Carolina State Bar's disbarment order. However, the bulk of misconduct addressed in the Order of Disbarment was not addressed in the parties' Agreement for Discipline by Consent and was not considered by the Court in its order suspending petitioner/respondent from the practice of law.

misconduct not previously considered by the Court, the Court should refuse to impose reciprocal discipline for the additional misconduct because of the infirmity of proof of the misconduct. He states he chose not to file an answer to the disciplinary complaint in North Carolina even though all the allegations were untrue because he would still have been subject to discipline in North Carolina as a result of his conviction for misprision of felony. Petitioner/respondent further asserts he feared that, if he challenged the North Carolina complaint, South Carolina would assume he did not recognize the wrongfulness and seriousness of the misconduct which would negatively impact his Petition for Reinstatement.[5] As a result, petitioner/respondent asserts the Court should not accept the unchallenged findings reported in the Order of Disbarment. We disagree.

Under the North Carolina State Bar's Discipline and Disability Rules, if a lawyer fails to file an answer to a complaint, the allegations contained in the complaint will be deemed admitted. 27 N.C. Admin. Code Chapter 1, Subchapter B § 0114(f). Since petitioner/respondent chose not to file an answer, he knowingly admitted the allegations in the North Carolina complaint and, therefore, is precluded from challenging them in the current proceeding.

Further, petitioner/respondent was entitled to challenge the allegations of misconduct in North Carolina. The Court would not have not looked negatively upon petitioner/respondent's assertion of his rights in that disciplinary proceeding.

### IV. Imposition of Same Discipline Would Result in Grave Injustice and Warrants Substantially Different Discipline

■ Petitioner/respondent argues that, if the Court concludes the imposition of reciprocal discipline is appropriate, it would be inequitable for this Court to disbar him for the misconduct found by the North Carolina State Bar because the Court has imposed lesser sanctions for similar misconduct. Petitioner/respondent claims that, at most, a sanction of

---

5. According to the Order of Disbarment, petitioner/respondent filed a document with the Disciplinary Hearing Commission in which he indicated he did not intend to participate in the matter.

twelve months, retroactive to the date of his twelve month suspension imposed on September 28, 2009, or an eight month suspension retroactive to September 9, 2010, the date of the North Carolina Order of Disbarment, should be imposed. We disagree.

In each of the cases cited by petitioner/respondent the disciplined lawyer was unaware that his misconduct assisted in the perpetuation of a criminal or fraudulent scheme committed by others. As noted in the Order of Disbarment, petitioner/respondent knowingly made false statements on HUD–1 Settlement Statements for the purpose of influencing the action of the lending institution. Further, petitioner/respondent pled guilty to misprision of felony, admitting that he knew of the actual commission of bank fraud from April 2003 through October 2004, but concealed the information by failing to inform a judge or other person in authority of the felony. We find disbarment is the appropriate sanction.

### Petition for Reinstatement

Since we disbar petitioner/respondent from the practice of law pursuant to the reciprocal disciplinary provisions of Rule 29, RLDE, we deny his Petition for Reinstatement. Further, the Court is extremely troubled by petitioner/respondent's failure to inform the Committee that he had been disbarred by the North Carolina State Bar on September 9, 2010, one month before the hearing on his Petition for Reinstatement. While we recognize Rule 33, RLDE, did not specifically require petitioner/respondent to inform the Committee of the North Carolina Order of Discipline,[6] petitioner/respondent affirmatively stated to the Committee "I haven't had any prior disciplinary orders except for this one [the Court's order suspending him from the practice of law in South Carolina]." This was patently untrue. Further, although he responded to numerous questions posed by the Committee about the bank fraud underlying his misprision of felony conviction, petitioner/respondent never advised the Committee that he had been disbarred in North Carolina as a result of his complicity in the bank fraud. Petitioner/respondent's statement and omission

---

**6.** Rule 33(f)(5), RLDE, does require a lawyer seeking reinstatement not to have engaged in any other professional misconduct *since* the lawyer's suspension or disbarment from which he seeks reinstatement.

indicate a lack of honesty, candor, and integrity which, alone, constitute a basis for denying his Petition for Reinstatement. *See* Rule 33(f)(6), RLDE (in order to be reinstated, lawyer must possess requisite honesty and integrity to practice law).

## CONCLUSION

After thorough review of the record, we deny the Petition for Reinstatement. Further, we hereby disbar respondent from the practice of law in this State pursuant to the reciprocal discipline provisions of Rule 29, RLDE. Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

TOAL, C.J., PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.

ATTACHMENT

NORTH CAROLINA

WAKE COUNTY

BEFORE THE DISCIPLINARY HEARING COMMISSION OF THE NORTH CAROLINA STATE BAR

09 DHC 3

THE NORTH CAROLINA STATE BAR, Plaintiff

v.

IVAN N. WALTERS, Attorney, Defendant

## ORDER OF DISCIPLINE

This matter is before a hearing panel of the Disciplinary Hearing Commission composed of J. Michael Booe, Chair, and members Robert F. Siler and Karen B. Ray. Brian P.D. Oten and Carmen Hoyme Bannon represent Plaintiff, the North Carolina State Bar. Defendant, Ivan N. Walters, filed a document with the DHC indicating that he did not intend to

participate in this matter and no counsel of record has appeared on his behalf.

On Plaintiff's motion, judgment by default was entered against Defendant. Based upon the pleadings and admissions pursuant to 27 N.C. Admin. Code Chapter 1, Subchapter B, § .0114(f) and Rule 8(d) of the Rules of Civil Procedure, the hearing panel hereby finds by clear, cogent, and convincing evidence the following

## FINDINGS OF FACT

1. Plaintiff, the North Carolina State Bar ("State Bar"), is a body duly organized under the laws of North Carolina and is the proper party to bring this proceeding under the authority granted it in Chapter 84 of the General Statutes of North Carolina, and the Rules and Regulations of the North Carolina State Bar (Chapter 1 of Title 27 of the North Carolina Administrative Code).

2. Defendant, Ivan N. Walters (hereafter "Defendant" or "Walters"), was admitted to the North Carolina State Bar in 1993 and is, and was at all times referred to herein, an Attorney at Law licensed to practice in North Carolina, subject to the rules, regulations, and Rules of Professional Conduct of the North Carolina State Bar and the laws of the State of North Carolina.

3. Defendant was properly served with process in this action.

4. Walters is also licensed to practice law in South Carolina. During all or part of the relevant periods referred to herein, Walters was engaged in the practice of law in the State of South Carolina and maintained a law office in Rock Hill, York County, South Carolina.

5. From 2003 through 2005, Walters served as closing attorney in multiple real estate transactions involving Kyle Edward Wimmer, who was later convicted of bank fraud and money laundering in connection with a real estate investment scheme.

6. During this period, Wimmer was the sole managing member, operator, and registered agent of Real Estate Investment Capital, Inc. ("REIC"), a South Carolina corporation.

Wimmer also owned and operated an entity called Landmark Remodeling.

7. Branch Banking and Trust (BB & T) was the mortgage lender in all of the real estate transactions described herein for which Walters served as closing attorney. BB & T's accounts are insured by the Federal Deposit Insurance Corporation (FDIC), a federal agency.

8. It is a violation of 18 U.S.C. § 1014 to knowingly make a false statement upon any application for the purpose of influencing in any way the action of any institution the accounts of which are insured by the FDIC.

9. In 2003, Vicky and Charles Snyder ("the Snyders") were the sole owners of Snyder Enterprises, Inc., a company that invested in rental properties. In or about July 2003, the Snyders agreed to sell seven of Snyder Enterprises' rental properties in Lexington, South Carolina, ("the Lexington properties") to Wimmer.

10. The Snyders agreed to sell the Lexington properties to Wimmer for the payoff amounts of the outstanding mortgage loan on the properties. Accordingly, the Snyders did not expect to make a profit on the sale, seeking only to be relieved of the debt associated with those properties.

11. Neither Wimmer nor anyone else provided a down payment or any other funds to the Snyders or to Snyder Enterprises in connection with the sale of the Lexington properties.

12. At Wimmer's instruction, the Snyders went to Walters's law office to complete paperwork for the sale of the Lexington properties to Wimmer.

13. At Walters's direction, Vicky Snyder signed seven blank HUD–1 Settlement Statements ("HUD–1s") and seven blank deeds.

14. Instead of purchasing the Lexington properties himself, Wimmer arranged for individuals from Utah to buy the Lexington properties. These buyers obtained mortgage loans from BB & T to fund the purchases.

15. Walters completed four of the HUD–1s signed by Vicky Snyder to reflect that Snyder Enterprises was selling

the properties identified on the HUD–1 to an individual from Utah for a purchase price of $125,000.00 per property. These four HUD–1s prepared by Walters also reflected that the buyer had paid a $25,000.00 deposit to Snyder Enterprises per property, and that the buyer brought approximately $1,900.00 to closing per property.

16. Walters's statements on the HUD–1s described in paragraph 15 above were false in that:

(a) The Snyders, on behalf of Snyder Enterprises, did not agree to a $125,000.00–per–property purchase price for four of the Lexington properties;

(b) None of the buyers in these four transactions paid $25,000.00 deposits;

(c) The Snyders, on behalf of Snyder Enterprises, did not receive $25,000.00–per–property deposits in connection with the sale of four of the Lexington properties; and

(d) None of the buyers in these four transactions brought approximately $1,900.00 to closing.

17. Wimmer paid the approximately $1,900.00 per closing which was shown on the HUD–1s as cash from the buyers.

18. Walters provided the four false HUD–1s described in paragraph 15 above to BB & T.

19. For each of these four transactions, BB & T loaned the buyer $100,000.00. After closing costs, Walters disbursed the remainder of the proceeds from each of the $100,000.00 loans as follows:

(a) $79,343.31 to pay off the existing mortgage; and

(b) $17,330.34 to Wimmer's company, Landmark Remodeling.

20. Landmark Remodeling had not performed any services on these four properties to earn the $17,330.34–per–property payment.

21. For the remaining three Lexington properties, Walters prepared HUD–1s reflecting that the individuals from Utah were refinancing properties they already owned. At the time he prepared these three HUD–1s, Walters knew that these individuals were not the record owners of the properties and

that the purpose of the loans was to enable them to purchase the properties.

22. Walters provided the three false HUD–1s described in paragraph 21 above to BB & T.

23. For each of these three "refinance" transactions, BB & T loaned the borrower $100,000.00.

24. For each of these three transactions, Walters disbursed the loan proceeds remaining after closing costs as follows:

(a) $79,343.31 to pay off the existing mortgage; and

(b) Approximately $15,800 to Wimmer's company, Landmark Remodeling.

25. Landmark Remodeling had not performed any services on these three properties to earn the approximately $15,800–per–property payment.

26. Wimmer directed Walters to make the disbursements to Landmark Remodeling described in paragraphs 19 and 24 above.

27. Walters knew or should have known, at the time he prepared the HUD–1s and made the disbursements for the sales of the Lexington properties, that Landmark had not performed any services on the Lexington properties.

28. Walters prepared the deeds transferring the Lexington properties from Snyder Enterprises to the various individuals from Utah.

29. The deeds Walters prepared for the transfer of the Lexington properties falsely reflected that the purchase price for each property was $125,000.00.

30. Walters caused the deeds reflecting false purchase prices for the Lexington properties to be filed in the public record.

31. In May 2003, Walters served as closing attorney for a transaction in which properties located at 807 Chesterfield Avenue and 1137 6th Street in Chester, South Carolina ("the Chesterfield Ave and 6th Street properties") were transferred on the same day from William & Diane Glassberg to REIC and from REIC to Robert Ellis.

32. The purchase price for REIC's purchase of the properties was $45,000.00. The purchase price for Ellis's purchase of the properties on that same day was $113,000.00.

33. Ellis obtained a $90,400.00 mortgage loan from BB & T to fund his purchase of the Chesterfield Ave and 6th Street properties.

34. Walters prepared the HUD–1 Settlement Statement for Ellis's purchase of these properties. The HUD–1 prepared by Walters showed REIC as the seller and reflected that the purchase price for the Chesterfield Ave and 6th Street properties was $113,000.00. The HUD–1 prepared by Walters also reflected that Ellis had paid REIC a deposit in the amount of $21,716.31, and that Ellis brought $2,415.50 to closing.

35. Walters's statements on the HUD–1 described in paragraph 34 above were false in that:
   (a) At the time the HUD–1 was prepared and submitted to the lender, REIC was not the record owner of the property;
   (b) Ellis did not pay any deposit to REIC;
   (c) The purchase price reflected on the HUD–1 was artificially inflated; and
   (d) Ellis did not bring any cash to closing.

36. The HUD–1 prepared by Walters in connection with Ellis's purchase of the Chesterfield Ave and 6th Street properties also stated that $90,126.90 of the loan proceeds would be disbursed to the seller, REIC. This statement was false, in that Walters actually disbursed only $44,316.90 to REIC. The remaining $45,810.00 of Ellis's loan proceeds were used to fund REIC's purchase of the Chesterfield Ave and 6th Street properties.

37. Walters did not disclose to his client, Ellis, information that he learned from his representation of REIC, to wit: That the properties securing the $90,400.00 loan to Ellis were being sold to REIC for $45,000.00 earlier that day, and that the loan proceeds for Ellis's purchase were used to fund REIC's purchase of the properties.

38. In May 2003, Walters served as closing attorney for a transaction in which seven properties located in Lancaster,

South Carolina were transferred from William & Diane Glassberg to REIC and, on that same day, four of those seven properties were transferred from REIC to Kendrick Hicks ("Hicks").

39. The total purchase price for REIC's purchase of the seven properties was $75,000.00. The purchase price for Hicks's purchase of the four properties on that same day was $116,000.00.

40. Hicks obtained a $92,800.00 mortgage loan from BB & T to fund his purchase of these four properties from REIC.

41. Walters prepared the HUD–1 Settlement Statement for Hicks's purchase of these four properties. The HUD–1 prepared by Walters showed REIC as the seller and reflected that the purchase price was $116,000.00. The HUD–1 prepared by Walters also reflected that Hicks had paid REIC a deposit in the amount of $23,200.00, and that Hicks brought $3,030.70 to closing.

42. Walters's statements on the HUD–1 described in paragraph 41 above were false in that:

(a) At the time the HUD–1 was prepared and submitted to the lender, REIC was not the record owner of the property;

(b) Hicks did not pay any deposit to REIC;

(c) The purchase price reflected on the HUD–1 was artificially inflated; and

(d) Hicks did not bring any cash to closing.

43. The HUD–1 prepared by Walters in connection with Hicks's purchase of these four properties also stated that all $92,800.00 of the loan proceeds would be disbursed to the seller, REIC. This statement was false, in that Walters actually disbursed only $16,651.65 to REIC. The remaining $76,148.35 of Hicks's loan proceeds were used to fund REIC's purchase of all seven of the properties.

44. Walters did not disclose to his client, Hicks, information that he learned from his representation of REIC, to wit: That the properties securing the $92,800.00 loan to Hicks were being sold to REIC for less than $75,000.00 earlier that day, and that the loan proceeds for Hicks's purchase were used to fund REIC's purchase of all seven of the properties.

45. In May 2004, Walters served as closing attorney for transactions in which properties located at 130 Saluda Street in Chester, South Carolina and 8 Elliott Street in Chester, South Carolina ("the Saluda and Elliott Street properties") were transferred on the same day from Eric McLaren and Carl Campbell, respectively, to REIC and from REIC to Sheila Pincock ("Pincock").

46. The total purchase price for REIC's purchase of the properties was $38,661.97. The purchase price for Pincock's purchase of these properties was $136,000.00.

47. Pincock obtained a $108,800.00 mortgage loan from BB & T to fund her purchase of the Saluda and Elliott Street properties.

48. Walters prepared the HUD–1 Settlement Statement for Pincock's purchase of the Saluda and Elliott Street properties and provided the HUD–1 to BB & T.

49. The HUD–1 prepared by Walters showed REIC as the seller and reflected that the purchase price for the Saluda and Elliott Street properties was $136,000.00. The HUD–1 prepared by Walters also reflected that Pincock had paid REIC a $27,200.00 deposit, and that Pincock brought $2,032.75 to closing.

50. Walters's statements on the HUD–1 described in paragraph 49 above were false in that:

(a) At the time the HUD–1 was prepared and submitted to the lender, REIC was not the record owner of the properties;

(b) Pincock did not pay any deposit to REIC;

(c) The purchase price reflected on the HUD–1 was artificially inflated; and

(d) Pincock did not bring any cash to closing.

51. Walters did not disclose to his client, Pincock, information that he learned from his representation of REIC, to wit: That the properties securing the $108,800.00 loan to Pincock were being sold to REIC for $38,661.97 that same day.

52. In January 2004, Walters served as closing attorney for a transaction in which REIC bought a property at 1301 N.

Lafayette Street in Shelby, North Carolina ("the Shelby property"). REIC bought this property for $49,600.00.

53. Several days later, Walters served as closing attorney for a transaction in which REIC sold the Shelby property to Marcus Beeson.

54. Beeson obtained an $84,100.00 loan from BB & T to fund his purchase of the Shelby property.

55. As closing attorney for Beeson's purchase of the Shelby property, Walters represented the buyer/borrower and the lender in the transaction.

56. Walters prepared the HUD–1 Settlement Statement for Beeson's purchase of the Shelby property. The HUD–1 prepared by Walters reflected that the loan was a refinance loan.

57. The HUD–1 prepared by Walters and described in paragraph 56 above was false in that:

   (a) At the time the HUD–1 was prepared and submitted to the lender, Beeson was not the record owner of the property;

   (b) The loan proceeds from BB & T were used to fund Beeson's purchase of the property.

58. In September 2004, Walters served as closing attorney for a transaction in which REIC bought a property at 130 Cushman Drive in Chester, South Carolina ("the Cushman property"). REIC bought this property for $22,500.00.

59. Several days later, Walters served as closing attorney for a transaction in which REIC sold the Cushman property to Jennifer Satterlee.

60. Satterlee obtained an $83,000.00 loan from BB & T to fund her purchase of the Cushman property.

61. Walters prepared the HUD–1 Settlement Statement for Satterlee's purchase of the Cushman property. The HUD–1 prepared by Walters reflected that the loan was a refinance loan.

62. The HUD–1 prepared by Walters and described in paragraph 61 above was false in that:

(a)  At the time the HUD–1 was prepared and submitted to the lender, Satterlee was not the record owner of the property;

(b)  The loan proceeds from BB & T were actually used to fund Satterlee's purchase of the property.

63.  Walters provided the HUD–1s described in paragraphs 56 and 61 above to the lender, BB & T.

64.  BB & T underwrote the loans as if they were refinance loans rather than purchase loans.

65.  Walters knew that BB & T would loan more money to the borrowers for a refinance loan than for a purchase loan.

66.  Walters prepared these false refinance HUD–1s to enable the borrower to borrow more money than otherwise would have been approved for a purchase loan.

67.  By submitting a false refinance HUD–1 to BB & T, Walters knowingly made false statements to an institution the accounts of which were insured by the FDIC for the purpose of influencing the action of that institution in violation of 18 U.S.C. § 1014.

68.  Walters disbursed the proceeds of Beeson's loan as follows:

(a)  $49,375.00 to REIC;  and

(b)  $32,981.00 to Landmark Remodeling.

69.  Walters disbursed the proceeds of Satterlee's loan as follows:

(a)  $21,284.77 to REIC;  and

(b)  $60,328.73 to Landmark Remodeling.

70.  Landmark Remodeling had not performed any services on the Shelby or Cushman properties to earn the $32,981.00 and $60,328.73 payments, respectively.

71.  Wimmer directed Walters to make the disbursements to Landmark Remodeling described in paragraphs 68 and 69 above.

72.  Walters knew or should have known, at the time he prepared the HUD–1s and made the disbursements described

in paragraphs 68 and 69 above that Landmark had not performed any services on the Shelby or Cushman properties.

73. In the following additional transactions, Walters also prepared HUD–1 Settlement Statements that falsely reflected that the loans were refinance loans when in fact the borrowers used the loan proceeds to purchase the properties:

| Property | Borrower | Seller | Date |
|---|---|---|---|
| 737 Ellis Avenue, NE Orangeburg, SC | Frederick Atherley | Southeastern Regional Housing Cooperative, Inc. | 12/12/2003 |
| 718 Sweeney Street Chester, SC & 215 Sanders Street Fort Mill, SC | Shawna Beeson | Rhett Hasell & REIC | 3/8/2004 & 3/9/2004 |
| 568 2nd Street & 538 4th Street Chester, SC | Janie Wade | Richard A. Hall | 8/18/2004 |
| 521 2nd Street Chester, SC | Russell Horne | REIC | 1/12/2005 |

74. In connection with each of the real estate closings on the list above, Walters provided the false HUD–1 to the lender, BB & T.

75. BB & T underwrote the loans as if they were refinance loans rather than purchase loans.

76. Walters knew that the lenders would loan more money to the borrowers for a refinance loan than for a purchase loan.

77. Walters prepared the false refinance HUD–1s to enable the borrowers to borrow more money than otherwise would have been approved for a purchase loan.

78. By submitting false refinance HUD–1s to BB & T, Walters knowingly made false statements to an institution the

accounts of which were insured by the FDIC for the purpose of influencing the action of that institution in violation of 18 U.S.C. § 1014.

79. Wimmer was convicted of bank fraud and money laundering in connection with the real estate investment scheme described in the preceding paragraphs. The United States District Court for the District of South Carolina sentenced Wimmer to 63 months in prison and ordered him to pay $4 million in restitution.

80. On 28 April 2008, Walters was charged with misprision of felony in connection with Wimmer's real estate investment scheme.

81. The elements of misprision of felony are: (1) having knowledge of the actual commission of a felony; and (2) concealing and failing to report the felonious conduct. *See* 18 U.S.C. § 4.

82. On 18 June 2008, Walters pled guilty to misprision of felony in violation of Title 18 U.S.C. § 4, South Carolina District Court file number 6:08–CR–385. Judgment was entered on 30 September 2008.

As previously found by default judgment and now recited herein, based on the foregoing Findings of Fact the hearing panel makes the following

## CONCLUSIONS OF LAW

1. All the parties are properly before the hearing panel and the panel has jurisdiction over Defendant, Ivan N. Walters, and the subject matter.

2. Defendant's conduct, as set out in the Findings of Fact above, constitutes grounds for discipline pursuant to N.C. Gen.Stat. § 84–28(b)(1), for his conviction of one count of misprision of felony in violation of 18 U.S.C. § 4, a criminal offense showing professional unfitness.

3. Defendant's conduct, as set out in the Findings of Fact above, also constitutes grounds for discipline pursuant to N.C. Gen.Stat. § 84–28(b)(2) as follows:

   (a) By directing the Snyders to sign blank HUD–1s and deeds and then completing those documents with false

information, Walters engaged in conduct involving fraud, deceit, or misrepresentation in violation of Rule 8.4(c);

(b) By following Wimmer's directive to disburse loan proceeds to Landmark Remodeling in connection with closings on the Lexington properties when he knew or should have known that Landmark had not performed any remodeling services on the properties, Walters assisted his client—Wimmer—in conduct he knew was criminal or fraudulent in violation of Rule 1.2(d), and engaged in conduct involving dishonesty, deceit or misrepresentation in violation of Rule 8.4(c);

(c) By knowingly preparing HUD–1s containing false information about the transfer of the Lexington properties, and providing those HUD–1s to the mortgage lender, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and committed criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer—to wit: violation of 18 U.S.C. § 1014—in violation of Rule 8.4(b);

(d) By knowingly preparing and filing in the public record deeds that reflected false purchase prices for the Lexington properties, Defendant engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

(e) By knowingly preparing a HUD–1 containing false information for the transactions involving the Chesterfield Ave and 6th Street properties and providing that HUD–1 to the mortgage lender, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and committed criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer—to wit: violation of 18 U.S.C. § 1014—in violation of Rule 8.4(b);

(f) By disbursing funds loaned by BB & T to Robert Ellis in a manner differing from the disbursements listed on the HUD–1 he provided to BB & T, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

(g) By acting as closing attorney for transactions in which he could not and did not disclose material information to his client, Robert Ellis, Walters engaged in representation involving a concurrent conflict of interest in violation of Rule 1.7(a);

(h) By knowingly preparing a HUD–1 containing false information about Hicks's closing and providing that HUD–1 to the mortgage lender, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and committed criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer—to wit: violation of 18 U.S.C. § 1014—in violation of Rule 8.4(b);

(i) By disbursing funds loaned by BB & T to Kendrick Hicks in a manner differing from the disbursements listed on the HUD–1 he provided to BB & T, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

(j) By acting as closing attorney for transactions in which he could not and did not disclose material information to his client, Kendrick Hicks, Walters engaged in representation involving a concurrent conflict of interest in violation of Rule 1.7(a);

(k) By knowingly preparing a HUD–1 containing false information about the transfer of the Saluda and Elliott Street properties and providing that HUD–1 to the mortgage lender, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and committed criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer—to wit: violation of 18 U.S.C. § 1014—in violation of Rule 8.4(b);

(*l*) By acting as closing attorney for transactions in which he could not and did not disclose material information to his client, Sheila Pincock, Walters engaged in representation involving a concurrent conflict of interest in violation of Rule 1.7(a);

(m) By preparing and providing BB & T with false refinance HUD–1s in the closings on the Shelby and Cushman properties, Walters engaged in conduct in-

volving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c), committed criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer—to wit: violation of 18 U.S.C. § 1014—in violation of Rule 8.4(b), and (with respect to the Shelby property transaction in which he represented BB & T) intentionally prejudiced his client—the lender—during the course of the professional relationship in violation of Rule 8.4(g);

(n) By following Wimmer's directive to disburse a portion of Beeson's and Satterlee's loan proceeds to Landmark Remodeling when he knew or should have known that Landmark had not performed any remodeling services on the properties, Walters assisted his client—Wimmer—in conduct he knew was criminal or fraudulent in violation of Rule 1.2(d), and engaged in conduct involving dishonesty deceit or misrepresentation in violation of Rule 8.4(c);

(o) By preparing and providing BB & T with false refinance HUD–1s in the additional transactions identified in paragraph 73, Walters engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and committed criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer—to wit: violation of 18 U.S.C. § 1014—in violation of Rule 8.4(b); and

(p) By engaging in the felonious conduct for which he was convicted, Walters committed a criminal act that reflects adversely upon his honesty, trustworthiness or fitness as a lawyer in violation of Rule 8.4(b), assisted his client—Wimmer—in conduct he knew was criminal or fraudulent in violation of Rule 1.2(d), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c).

Based upon the foregoing Findings of Fact and Conclusions of Law, the hearing panel hereby finds by clear, cogent, and convincing evidence the following additional

## FINDINGS OF FACT REGARDING DISCIPLINE

1. The findings in paragraphs 1 through 82 above are reincorporated as if fully set forth herein.

2. Walters has substantial experience in the practice of law.

3. Walters was obligated, as closing attorney, to produce accurate HUD–1 statements for the transactions he closed. Accurate HUD–1s are necessary for the system of finance in real estate to function.

4. The falsely inflated purchase prices and false downpayments shown on the HUD–1s Walters provided to BB & T were designed to mislead the lender about the value of the properties which served as collateral for the mortgage loans.

5. . Banks are not normally thought of as vulnerable entities. Nevertheless, lending institutions are placed at risk by the conduct of attorneys who circumvent or knowingly facilitate others' circumvention of safeguards employed to avoid fraud.

6. Walters's preparation and submission of HUD–1s that failed to accurately show the receipt and disbursement of funds for numerous transactions evaded the safeguards relied upon by lenders in mortgage loan transactions.

7. Walters's preparation and submission of HUD–1s that made purchase transactions falsely appear to be refinance transactions resulted in significant harm in that it furthered and helped effectuate a scheme whereby the bank loaned significantly more than it otherwise would have for a given transaction.

8. The buyers in the transactions described herein were Walters's clients. As buyers, one of their goals was not to pay an unnecessarily inflated price for properties they were purchasing. Walters's failure to disclose to his clients that the properties they were purchasing had just been sold for far lesser sums impaired the buyers' ability to avoid paying unnecessarily inflated prices.

9. Walters engaged in multiple and similar instances of conduct involving misrepresentation and deceit over a substantial period of time.

650

10.  Clients are entitled to attorneys they can trust. Walters, by engaging in conduct involving misrepresentation and deceit over a substantial period of time, has shown himself to be untrustworthy.

11.  Walters engaged in criminal conduct while acting in his capacity as a lawyer. His criminal conduct involved dishonesty.

12.  Walters's criminal conviction is a matter of public record.

13.  When a lawyer is convicted of a serious crime, particularly a crime involving dishonesty, it brings the legal profession into disrepute.

14.  The hearing panel has carefully considered all of the different forms of discipline available to it in considering the appropriate discipline to impose in this case.

Based upon the foregoing Findings of Fact, Conclusions of Law, and additional Findings of Fact Regarding Discipline, and upon consideration of the factors set forth in 27 N.C. Admin. Code Chapter 1, Subchapter B, § .0114(w), the hearing panel hereby enters the following additional

*CONCLUSIONS OF LAW REGARDING DISCIPLINE*

1.  The hearing panel has carefully considered all of the factors enumerated in 27 N.C.A.C. 1B § .0114(w) of the Rules and Regulations of the North Carolina State Bar. The hearing panel finds evidence of the following factors:

   (a)  From Rule .0114(w)(1):

   i.   Intent of Defendant to cause the resulting harm or potential harm, in that Walters knowingly prepared and submitted false HUD–1s to the banks in order to assist Wimmer in fraudulent activity;

   ii.  Intent of Defendant to commit acts where the harm or potential harm is foreseeable: Our financial system is dependent upon accuracy and truthfulness in disclosure, and harm or potential harm is foreseeable anytime a financial institution is asked to make a loan decision based upon false information;

iii. Circumstances reflecting Defendant's lack of honesty, trustworthiness or integrity;

iv. Impairment of clients' ability to achieve the goals of the representation; and

v. Acts of dishonesty, misrepresentation, deceit, or fabrication. Walters deceived BB & T by preparing and submitting false HUD–1s and admitted (by virtue of his plea) to knowingly concealing and/or failing to report Wimmer's bank fraud and money laundering scheme.

(b) From Rule .0114(w)(2):

i. Acts of dishonesty, misrepresentation, deceit, or fabrication, as stated in the Rule violations found and further articulated in these findings and conclusions regarding discipline; and

ii. Commission of a felony.

(c) From Rule .0114(w)(3):

i. Dishonest motive;

ii. A pattern of misconduct

iii. Multiple offenses; and

iv. Substantial experience in the practice of law.

2. Walters's conduct resulted in at least potential significant harm to the profession due to the public nature of his criminal charges and conviction.

3. Walters's conduct resulted in significant harm and/or potential harm to BB & T. Walters's conduct evaded safeguards relied upon by BB & T. BB & T loaned significantly more than it otherwise would have in the transactions Walters falsely characterized as "refinances," and may have approved other loans based on false information submitted by Walters.

4. Walters's pattern of dishonest conduct poses potential significant harm to the public that may seek to retain him or those who may deal with him in other capacities. When a lawyer violates the trust clients and others should be able to have in attorneys, it harms the public and the profession.

5. The hearing panel has carefully considered admonition, reprimand, censure, suspension and disbarment in considering the appropriate discipline in this case.

6. The hearing panel finds that admonition, reprimand, censure or suspension would not be sufficient discipline because of the gravity of harm to clients, the public, and the profession in the present case.

7. The hearing panel concludes that discipline short of disbarment would not adequately protect the public for the reasons stated above and for the following reasons:

    a. Walters committed misdeeds involving moral turpitude and violations of the public trust, including fraudulent conduct, material misrepresentations, and deceit. Misconduct involving misrepresentations and deceit are among the most serious that an attorney can commit. Such offenses demonstrate that the offending attorney is not trustworthy. Clients are entitled to have trustworthy attorneys;

    b. Walters repeatedly engaged in criminal acts reflecting adversely on his honesty, trustworthiness or fitness as a lawyer.

    c. Entry of an order imposing less serious discipline would fail to acknowledge the seriousness of the offenses Walters committed, would be inconsistent with discipline issued in prior cases involving similar misconduct, and would send the wrong message to attorneys and the public regarding the conduct expected of members of the Bar of this State.

    d. The protection of the public and the legal profession requires that Walters not be permitted to resume the practice of law until he demonstrates the following: that he has reformed; that he understands his obligations to his clients, the public, and the legal profession; and that permitting him to practice law will not be detrimental to the public or the integrity and standing of the legal profession or the administration of justice. Disbarred lawyers are required to make such a showing before they may resume practicing law.

Based upon the foregoing Findings of Fact, Conclusions of Law, and additional Findings of Fact and Conclusions of Law Regarding Discipline, the hearing panel hereby enters the following

## *ORDER OF DISCIPLINE*

1. Defendant, Ivan N. Walters, is hereby DISBARRED from the practice of law.

2. Defendant shall surrender his license and membership card to the Secretary of the North Carolina State Bar no later than 30 days following service of this order upon Defendant.

3. Defendant shall pay the costs of this proceeding as assessed by the Secretary of the North Carolina State Bar. Defendant must pay the costs within 30 days of service upon him of the statement of costs by the Secretary.

4. Defendant shall comply with all provisions of 27 NCAC 1B § .0124 of the North Carolina State Bar Discipline & Disability Rules.

Signed by the Chair with the consent of the other hearing panel members, this the *9* day of *September,* 2010.

s/ J. Michael Booe

J. Michael Booe, Chair
Disciplinary Hearing Committee